# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sonja J. Nicholson,                          Civil No. 06-2862 (DSD/SRN)

      Plaintiff,

      v.                                   **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

---

    Jennifer Mrozik, Esq., Northwest Disability Services, 1611 West County Road B, Suite 106, Roseville, Minnesota 55113, on behalf of Plaintiff

    Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South 4th Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Sonja J. Nicholson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who determined that Plaintiff was not entitled to disability insurance benefits or supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq. and 1381 et seq. The parties have submitted cross motions for summary judgment. (Doc. Nos. 12, 15.) The motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 12) be denied and Defendant's Motion for Summary Judgment (Doc. No. 15) be granted.

## I.   BACKGROUND

### A.   Procedural History

Plaintiff filed applications for disability insurance benefits and supplemental security benefits on September 26, 2002, alleging that she became disabled by depression on February 15, 2002.  (Tr. at 217-19, 241, 471-72.)  Plaintiff's applications were denied initially and upon reconsideration.  (Id. at 160-63, 177-79, 473-77.)  Plaintiff appealed and sought a hearing before an Administrative Law Judge (ALJ), which was held on June 10, 2004.  (Id. at 40.)  The ALJ denied Plaintiff's claims in a decision dated January 10, 2005.  (Id. at 164-76.)  Plaintiff filed a request for review with the Appeals Council, which granted the request.  (Id. at 203.)  The Appeals Council remanded the case for further proceedings because a page was missing from the ALJ's decision and because the ALJ failed to ask the vocational expert (VE) if his testimony was consistent with the Dictionary of Occupational Titles (DOT).  (Id. at 202-04.)

The ALJ held a second hearing on December 15, 2005.  (Id. at 122.)  Plaintiff's counsel stated at the beginning of the hearing that additional medical records existed, which he believed supported a further diagnosis of agoraphobia with panic disorder.  (Id. at 128.)  The records were submitted to the ALJ after the hearing.  (Tr. Index at 6; Tr. at 409-70.)  On January 30, 2006, the ALJ issued a second decision, again finding that Plaintiff was not disabled.  (Tr. at 21-31.)  The Appeals Council denied Plaintiff's request for review of this decision.  (Id. at 13.)  Thus, the ALJ's second decision became the Commissioner's final decision in this matter.  See 20 C.F.R. §§ 404.961, 416.1481.

Plaintiff filed her Complaint in federal court on June 30, 2006.  (Doc. No. 1.)  In seeking summary judgment, she asks the Court to reverse the ALJ on the following grounds: (1) the ALJ did

not fully develop the record with respect to her psychological impairments; (2) the ALJ failed to give proper weight to the opinions of her treating physicians; (3) the ALJ did not correctly assess her credibility; and (4) the ALJ failed to establish that testimony from the VE was consistent with the DOT. The Commissioner opposes Plaintiff's motion in all respects.

**B.      Factual Background**

Plaintiff testified to the following at the second administrative hearing.  As of December 2005, Plaintiff was taking Effexor, Tamazapam, and Wellbutrin.  (Tr. at 130-31.)  She lived alone.  (<u>Id.</u> at 132.)  Plaintiff could walk only half a block because of back pain.  (<u>Id.</u> at 135.)  Plaintiff nevertheless had ceased treatment for her back pain in 2003 because her doctor wanted to inject dye for a test, and Plaintiff did not like needles. (<u>Id.</u> at 137.)

Plaintiff's attorney acknowledged during the second hearing that Plaintiff's essential impairments were psychological.  (<u>Id.</u> at 127-28.)  Plaintiff testified that she experienced panic attacks a few times a week, and each attack lasted less than thirty minutes.  (<u>Id.</u> at 136-37, 139.)  Plaintiff also testified that she confined herself to her home unless she had a doctor's appointment or matter to attend such as the disability hearing.  (<u>Id.</u> at 139.)  She avoided spending Thanksgiving and Christmas with her family because there were too many people.  (<u>Id.</u> at 139-40.)  She acknowledged that the frequency of her panic attacks had decreased after she began taking some new medication.  (<u>Id.</u> at 141-42.)

**C.      Medical Evidence in the Record**

Plaintiff was first diagnosed with depression as a teenager after she attempted suicide.  (<u>Id.</u> at 333.)  Plaintiff has a history of two other suicide attempts in the late 1990s.  (<u>Id.</u>)  After a period of time with intermittent treatment of her depression, she reestablished medical care in 2001.  (<u>Id.</u>)  At an

appointment with Dr. Yelena Garbouzova, Plaintiff reported feeling anxious and depressed and having panic attacks, but she denied suicidal ideation.  (Id.)  Dr. Garbouzova diagnosed Plaintiff with a recurrent major depressive disorder, chemical dependence in remission, asthma, and obesity.  (Id. at 335.)

Plaintiff began treatment with Dr. Paul Jandl on January 9, 2002.  (Id. at 320.)  She reported feeling moody and tired.  (Id.)  Dr. Jandl diagnosed Plaintiff with a mild, recurrent, major depressive disorder and a history of alcohol abuse.  (Id.)  He prescribed Prozac.  (Id.)

On January 18, 2002, Plaintiff saw a family practitioner, Dr. Philip Weber, for back and leg pain.  (Id. at 338.)  Dr. Weber noted a little tenderness and pain with flexion and extension in Plaintiff's legs, but full strength, sensation, and range of motion.  (Id.)  Dr. Weber's diagnosis was low back strain with sciatica.  (Id.)

A few months later, on March 1, 2002, Plaintiff had a routine appointment with Dr. Jandl, at which she reported feeling hopeless, worried, and stressed, but also relieved by the recent loss of her job.  (Id. at 316.)  Dr. Jandl diagnosed Plaintiff with a severe, recurrent, major depressive disorder and dysthymia.  (Id.)  He prescribed Zoloft in addition to Prozac.  (Id.)  Plaintiff returned to Dr. Jandl on March 29, 2002, and reported "feeling much better."  (Id. at 314.)  Dr. Jandl's assessment was a mild, recurrent, major depressive disorder and dysthymia.  (Id.)  He continued her prescriptions of Prozac and Zoloft, noting that Plaintiff had not been complying with her medication regimen.  (Id. at 314-15.)

On July 17, 2002, Plaintiff revisited Dr. Jandl for a routine medication management appointment.  (Id. at 313.)  Plaintiff said that her mood was better, ranking it a seven on a ten-point scale.  (Id.)  She denied any suicidal ideation.  (Id.)  Dr. Jandl noted that Plaintiff was occasionally

depressed and mildly anxious but also that she had fair insight and judgment and a logical thought process.  (Id.)

On January 23, 2003, Dr. Alford Karayusuf conducted a psychiatric examination of Plaintiff. (Id. at 349.)  He recounted her medical history, including her long-term depression.  (Id.)  Dr. Karayusuf also noted that Plaintiff was oriented to time, place, and person, but that her immediate recall was poor.  (Id.)  She appeared mildly to moderately depressed.  (Id. at 351.)  Dr. Karayusuf diagnosed Plaintiff with dysthymia and major depression in partial remission.  (Id.)  He suggested that Plaintiff could understand, retain, and follow simple instructions, but that she should be restricted to brief and superficial interaction with others.  (Id.)  He also suggested that Plaintiff could perform simple, routine, and repetitive tasks with normal pace and persistence.  (Id.)

On February 21, 2003, psychological consultant Dr. Michael DeSanctis completed a mental residual functional capacity assessment of Plaintiff.  (Id. at 371-89.)  Dr. DeSanctis found that Plaintiff was not significantly limited in most respects.  (Id. at 371.)  However, he considered Plaintiff moderately limited in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, setting realistic goals and making plans independently of others, and completing a normal workday and workweek without interruptions from psychologically-based symptoms.  (Id. at 371-72.)  Dr. DeSanctis evaluated Plaintiff's mental impairments under Listing 12.04, Affective Disorders.  (Id. at 378.)  He found that she had a depressive syndrome marked by sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, or hallucinations.  (Id.)  In rating her functional limitations under the "B" criteria of the listings, Dr. DeSanctis considered Plaintiff functionally limited to a moderate

degree in activities of daily living and in maintaining concentration, persistence, and pace.  (Id. at 385.)

Dr. DeSanctis also characterized Plaintiff as mildly to moderately limited in social functioning.  (Id.)

There were no episodes of decompensation.  (Id.)  Dr. DeSanctis's ultimate opinion was that although

Plaintiff suffered a severe mental impairment, it did not meet or equal any psychological listing.  (Id. at

389.)

On September 24, 2003, Plaintiff saw Dr. Jandl for a medication management appointment.

(Id. at 393.)  Plaintiff reported that her mood varied from four to eight on a ten-point scale, but that she

had no suicidal thoughts.  (Id.)  She also reported having some panic attacks, low energy, and mild to

moderate anxiety.  (Id.)  Dr. Jandl found Plaintiff lethargic but with good attention and concentration.

(Id.)  He diagnosed her with a mild, recurrent, major depressive disorder and dysthymia.  (Id.)  Dr.

Jandl renewed her prescriptions for Prozac and Seroquel and started her on Wellbutrin.  (Id.)

Plaintiff saw Dr. Karen Lucas on September 25, 2003, for treatment of her back pain.  (Id. at

391.)  Dr. Lucas thought that Plaintiff did not appear to be in acute distress and actually moved quite

easily.  (Id.)  The doctor diagnosed Plaintiff with recurrent low back strain and refilled her prescriptions

for Ibuprofen and Vicodin.  (Id.)  Dr. Lucas noted that Plaintiff's back problems "really would not

qualify for any type of SSI disability."  (Id. at 392.)

On June 1, 2004, Plaintiff saw Shirley Melaas, a nurse in Dr. Jandl's practice.  (Id. at 405.)

Plaintiff said she was having suicidal thoughts and wanted to go to the hospital.  (Id.)  Ms. Melaas'

impression was that Plaintiff had severe, recurrent, major depression, and Ms. Melaas approved

Plaintiff's plan to go to Fairview Hospital's emergency room.  (Id.)

On June 8, 2004, Dr. Lucas completed a Medical Assessment of Ability To Do Work-Related

6

Activities (Physical) form.  (Id. at 400.)  Dr. Lucas wrote that Plaintiff was affected by physical

symptoms only about one week a year.  (Id. at 400, 401.)  Dr. Lucas imposed no restrictions other

than limiting Plaintiff to sitting no more than six hours in an eight-hour workday.  (Id. at 401-03.)

Plaintiff returned to Dr. Jandl for an appointment on June 11, 2004, after which the doctor

noted that Plaintiff was precluded from working "at this time."  (Id. at 406.)  No explanation was given

other than a reference to two previous session notes.  (Id.)  Dr. Jandl saw Plaintiff a few weeks later on

June 15, 2004, for medication management.  (Id. at 466.)  Ms. Melaas also attended the appointment,

and she asked Plaintiff about her visit to the emergency room a few weeks earlier.  (Id.)  Plaintiff said

the hospital refused to admit her because she did not have a "medical card."  (Id.)  Plaintiff did not go

back to the hospital the next day because she felt better.  (Id.)

Plaintiff scheduled an appointment with Dr. Daniel Hathaway, at the request of Dr. Lucas, on

October 12, 2004.  (Id. at 456-57.)  Dr. Hathaway considered Plaintiff's complaints of pain and

achiness, commenting that Plaintiff had difficulty localizing any pain or swelling.  (Id. at 457.)  Dr.

Hathaway concluded that Plaintiff suffered from sleep apnea with secondary fibromyalgia.  (Id. at 458.)

He recommended that Plaintiff increase her aerobic exercise.  (Id.)

Plaintiff did not visit Dr. Jandl again until November 26, 2004.  (Id. at 452.)  Plaintiff told Dr.

Jandl she was having panic attacks and suicidal thoughts, and that she felt depressed and unmotivated.

(Id.)  She admitted that she frequently forgot to take her medicine.  (Id.)  Dr. Jandl characterized

Plaintiff as doing "poorly" but noted also that Plaintiff had "very poor compliance with treatment."  (Id.

at 452-53.)  On February 15, 2005, Plaintiff saw Dr. Jandl for a follow-up appointment.  (Id. at 436.)

She was experiencing anxiety and some insomnia, but she denied having any panic attacks or suicidal

thoughts.  (Id.)  Dr. Jandl noted that Plaintiff "continues to do poorly but is making no efforts to improve her functioning, rather[, she] stays at home and does not participate in any activities."  (Id.)

Plaintiff returned to Dr. Lucas on April 14, 2005, for treatment of her back pain.  (Id. at 429.) Plaintiff described having one or two painful flare-ups a year.  (Id.)  Dr. Lucas noted that Plaintiff moved easily without limitation, although there was some tenderness.  (Id. at 431.)  Dr. Lucas prescribed a low dose of Neurontin and recommended that Plaintiff improve her back hygiene and increase her exercise.  (Id.)

Plaintiff's final visit with Dr. Jandl was on May 27, 2005, because Dr. Jandl was leaving his practice.  (Id. at 428.)  Plaintiff reported having daily panic attacks, each lasting several minutes.  (Id.) Plaintiff said she felt hopeless and unenergetic but denied feeling suicidal.  (Id.)  Dr. Jandl found Plaintiff to be of average mood, having clear thought processes and no psychoses, and with fair insight and judgment.  (Id.)  Dr. Jandl decided to adjust Plaintiff's medication, attributing her panic attacks to the Seroquel.  (Id.)  Dr. Jandl diagnosed Plaintiff with agoraphobia with panic disorder, major depressive disorder in partial remission, and a dysthymic disorder.  (Id.)

Plaintiff saw Dr. Hermansen on July 7, 2005.  (Id. at 422.)  She reported feeling anxious, sleeping poorly, and having low energy.  (Id.)  Plaintiff told Dr. Hermansen that she was anxious around crowds and was frightened of increasing her social contacts.  (Id. at 422-23.)  Plaintiff visited Dr. Hermansen again on October 6, 2005.  (Id. at 418.)  Although Plaintiff said she was experiencing less irritability and anxiety, she rarely left the house without someone.  (Id.)  She was also chronically tired. (Id.)  Dr. Hermansen's impressions were that Plaintiff was "doing modestly better" with some new medications, Effexor and Elavil.  (Id. at 419.)  Nevertheless, Dr. Hermansen also felt that Plaintiff was

8

significantly impaired during the day, due in part to tiredness.  (Id.)  Dr. Hermansen suspected sleep

apnea and recommended that Plaintiff see her primary care physician, Dr. Lucas, for this.  (Id.)

Plaintiff returned to Dr. Hermansen on October 31, 2005.  (Id. at 413.)  She told the doctor

that she was feeling "fair" but that she was having trouble sleeping.  (Id.)  Although Plaintiff had wanted

to leave her house at times, she said she was not able to because of her agoraphobia.  (Id.)  On the

other hand, Plaintiff said that she did not really want to leave her home or spend time with others.  (Id.)

Dr. Hermansen diagnosed Plaintiff with panic disorder with agoraphobia, recurrent major depression,

dysthymia, a history of alcohol dependence, fibromyalgia, back pain, knee pain, morbid obesity, and

probable sleep apnea.  (Id. at 414.)  He noted that Plaintiff was a "challenging case to sort through"

and that "it's a bit unclear what truly all is going on."  (Id.)  Dr. Hermansen completed a Medical

Opinion Form following this visit.  (Id. at 408.)  He recorded a diagnosis of major depression or bipolar

disorder, agoraphobia, and panic attacks.  (Id.)  He also remarked that Plaintiff would not be able to

perform any employment in the foreseeable future.  (Id.)

Dr. Hermansen next saw Plaintiff on December 1, 2005.  (Id. at 409.)  In his treatment note,

the doctor first wrote that Plaintiff had misunderstood her medication regimen since her last visit and

had ceased taking all of her medications.  (Id.)  When she resumed taking her medicine, she reported

feeling the best she had "felt in at least the last couple years."  (Id.)  However, Plaintiff also described

herself as lazy and unmotivated.  (Id.)  Dr. Hermansen wrote that Plaintiff "has no incentive to do much

outside the home other than some shopping as necessary and brief contact with family."  (Id.)  Dr.

Hermansen also wrote, on the other hand, that Plaintiff felt "too frightened to do much outside of her

home."  (Id.)  The doctor encouraged Plaintiff to "expand people, connections outside of her home."

(Id. at 410.)

### D.    Evidence from the VE

The ALJ consulted with VE Kenneth Ogren, who testified at the hearing.  The ALJ asked the

VE to consider a hypothetical female, aged thirty-eight to forty-two, with recurring low back pain, right

knee pain, chondromalacia,[1] obesity, and a major depressive disorder.  (Id. at 143, 146.)  The ALJ

instructed the VE that the person would be limited to light exertion, lifting and carrying ten pounds

frequently, lifting and carrying twenty pounds occasionally, no repeated kneeling or squatting, rare use

of stairs, and occasional bending, crouching, and stooping.  (Id. at 144-45.)  The ALJ also limited the

hypothetical person to unskilled or lower semi-skilled work, brief superficial contact with others, and no

rapid pace or high production goals.  (Id. at 147.)

In response, the VE testified that Plaintiff was precluded from her past employment as a cashier

but that she could work in approximately 900 positions as a food sorter, 500 jobs as a "stuffer" in the

printing industry, and 200 jobs as a laundry worker.  (Id. at 147-48.)  The VE specifically referred to

the DOT throughout his testimony, such as identifying each recommended job by DOT listing (Id. at

147-50.)  In addition, where the number of jobs suitable for Plaintiff differed from the DOT listing, the

VE explained why he reduced the number.  (Id.)

Upon questioning from Plaintiff's attorney, the VE testified that none of the possible jobs could

be performed solely in the home.  (Id. at 150.)  Similarly, the VE testified that a person who suffered

two panic attacks every week on the job would not be employable.  (Id.)

---

[1] Chondromalacia is a knee disorder involving the right knee cap.  (Id. at 144.)

E.      **The ALJ's January 30, 2006 Decision**

As a threshold matter, the ALJ noted that Plaintiff met the insured status requirements for entitlement to benefits from the alleged onset of disability date through the date of the decision.  (Id. at 22.)  The ALJ found that Plaintiff is a forty-one year old individual with a ninth grade education and past relevant work as a cashier.  (Id.)  He agreed that her alleged onset of disability date was February 15, 2002, and resulted from recurrent low back pain, right knee pain, depression, and anxiety.  (Id.)

The ALJ then engaged in the required five-step sequential evaluation: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) whether the claimant is capable of returning to work she has done in the past; and (5) whether the claimant can do other work that exists in significant numbers in the regional or national economy.  See 20 C.F.R. §§ 404.1520(a)-(f), 416.920.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 15, 2002.  (Id. at 22.)  The ALJ determined that Plaintiff was severely impaired by recurrent low back strain with an element of sciatica, chondromalacia of the right knee, major depressive disorder, dysthymia, and polysubstance abuse disorder, but that these impairments did not meet or medically equal a listed impairment.  (Id. at 22-25, 30.)  Specifically with respect to assessing Plaintiff's mental impairments at step three, the ALJ placed great weight on Dr. DeSanctis' opinion that Plaintiff experienced moderate restrictions in her activities of daily living, mild to moderate difficulties with social functioning, and moderate difficulties maintaining concentration, persistence, and pace, but had experienced no episodes of decompensation.  (Id. at 24.)

11

Turning to step four, the ALJ determined Plaintiff's residual functional capacity (RFC).  (Id. at 25.)  He considered all of the medical opinions in the record and Plaintiff's symptoms, including her complaints of pain.  (Id.)  The ALJ accepted Plaintiff's complaints of pain and functional limitations as credible and reduced her RFC correspondingly.  (Id.)  However, he did not accept as credible her ultimate claim of inability to perform any work, specifically citing inconsistences in the medical record and in Plaintiff's reported daily activities.  (Id. at 25-28.)  The ALJ determined that Plaintiff had an RFC for light work, lifting twenty pounds occasionally and ten pounds frequently; standing or walking for six hours and sitting for two hours in an eight-hour workday; and occasionally bending, crouching, stooping, and climbing stairs; but no working with ladders, ropes, or scaffolds.  (Id. at 25.)  In addition, due to Plaintiff's mental impairments, the ALJ limited her to unskilled or lower semi-skilled work with only brief contact with others, where high pace and production goals were not required.  (Id.)

The ALJ opted not to give controlling weight to Dr. Jandl's opinion in October 2005 that Plaintiff could not work due to frequent suicidal thoughts and agoraphobia.  (Id. at 29.)  The ALJ determined that Dr. Jandl's opinion was inconsistent with other record evidence because subsequent to the opinion, Plaintiff reported feeling better than she had in years; her medication was adjusted to alleviate her symptoms; and Plaintiff was leaving the house more often and increasing her social contacts.  (Id.)

The ALJ accepted the VE's position that Plaintiff's RFC precluded her from performing her past relevant work as a cashier.  (Id.)  Thus, reaching step five, the ALJ relied on the VE's testimony to find that Plaintiff could work in approximately 900 positions as a food sorter, 500 jobs as a "stuffer" in the printing industry, and 200 jobs as a laundry worker.  (Id. at 30.)  The ALJ noted in his decision that

the VE's testimony was consistent with the information contained in the DOT.  (Id.)

## II.     STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death.  Id. § 423(d)(1)(A).

### A.     Administrative Review

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  Id. § 404.929.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  Id. §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

**B.    Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.    The credibility findings made by the ALJ.
2.    The plaintiff's vocational factors.
3.    The medical evidence from treating and consulting physicians.
4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5.    Any corroboration by third parties of the plaintiff's impairments.
6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf

14

v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.   DISCUSSION

### A.    Whether the ALJ Fully and Fairly Developed the Record of Plaintiff's Psychological Impairments

Plaintiff first asserts that the ALJ did not fully and fairly develop the record with respect to her psychological impairments.  Plaintiff specifically contends that the ALJ did not consider her panic disorder and agoraphobia, and that if the ALJ did not choose to accept these diagnoses, he should have ordered a consultative examination.

An ALJ has "a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  However, the ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (citing Snead, 360 F.3d at 839).  The ALJ should consider "all the evidence in the record" in determining a claimant's limitations caused by her impairments, including "the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

15

In the present case, the ALJ ordered a consultative examination from Dr. Karayusuf in January 2003. Admittedly, this was about three years before the ALJ's second decision and before Dr. Hermansen's treatment of Plaintiff began. At the time Dr. Karayusuf examined Plaintiff, however, there was evidence of Plaintiff's panic attacks and reluctance to leave the house in her medical history. Dr. Karayusuf's opinion was therefore still credible and relevant.

In addition, evidence from Plaintiff's own physicians supports the ALJ's conclusions, which meant the ALJ did not need to obtain additional evidence. Dr. Jandl treated Plaintiff from January 2002 until May 2005. Dr. Jandl never suggested that Plaintiff was permanently disabled by her mental impairments. The only evidence in the record from Dr. Jandl that Plaintiff was disabled was in June 2004 when he remarked that Plaintiff was precluded from working "at this time." (Tr. at 406.) This evidence does not establish that Plaintiff could not "function in the workplace for a period of at least twelve months." See Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007). Dr. Jandl also commented during his treatment of Plaintiff that she voluntarily stayed at home and refrained from participating in activities, and that she made no efforts to improve her functioning. Finally, Dr. Jandl noted on several occasions that Plaintiff's symptoms improved with adjustments in her medications and when she followed her medication regimen.

Dr. Hermansen saw Plaintiff for approximately six months in 2005. Although he diagnosed Plaintiff with agoraphobia and a panic disorder, his comments about those diagnoses were mixed. In July 2005, Dr. Hermansen commented that Plaintiff's symptoms had improved with new medication. (Tr. at 419.) Plaintiff told Dr. Hermansen in October 2005 that she did not want to spend more time outside her home. (Id. at 413.) Dr. Hermansen noted after at least one appointment that Plaintiff's

case was challenging and that he did not have a complete understanding of her condition.  (Id. at 414.)

In December 2005, Dr. Hermansen wrote that Plaintiff had stopped taking all of her medicines, but

after she resumed taking them, she felt the best she had in years.  (Id. at 409.)  Dr. Hermansen

recorded Plaintiff's lack of motivation and incentive as additional explanations for her leaving the home

infrequently.  (Id.)

The ALJ found from the record before him that although Plaintiff "tends to isolate herself, the

record does not suggest that she has experienced an inability to leave her home . . . ."  (Tr. at 25)

(emphasis added).  This finding is consistent with the treatment notes of Plaintiff's treating physicians

and with Plaintiff's self-reports.  It is not an instance where the ALJ substituted his own judgment,

unsupported by the record.  The Court concludes that the ALJ was not required to further develop the

record of Plaintiff's psychological impairments.  Although the Court might have proceeded differently,

the Court cannot substitute its own judgment for that of the ALJ.  Substantial evidence exists to support

the ALJ's decision, and the ALJ therefore should be affirmed in this respect.

**B.      Whether the ALJ Gave Proper Weight to the Opinions of Plaintiff's Treating**
**         Physicians**

Plaintiff next argues that the ALJ failed to give proper weight to the opinions of her treating

physicians, Dr. Jandl and Dr. Hermansen.  She believes the ALJ disregarded the records she submitted

after the hearing, and she notes that Dr. DeSanctis's opinion, on which the ALJ heavily relied, was

rendered before many of the relevant medical records existed.

"A treating physician's opinion is generally entitled to substantial weight . . . ."  Kelley v.

Callahan, 133 F.3d 583, 589 (1998).  An ALJ need not give controlling weight to a doctor's

17

assessment that is inconsistent with other substantial evidence in the record, however.  Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).  In addition, an ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements."  Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).

Given that the ALJ repeatedly referred to the post-hearing records in his decision, it is clear he did not disregard them.  Moreover, there are inconsistencies in Dr. Jandl's and Dr. Hermansen's opinions, of which the ALJ properly took note.  For example, Dr. Jandl's  characterizations of Plaintiff's depression ranged from mild to severe, and Dr. Hermansen noted that Plaintiff was not compliant with treatment and was not motivated to leave her home.

As to Dr. Hermansen's opinion that Plaintiff was not able to perform any employment in the foreseeable future, this is a vague and conclusory statement.  Dr. Hermansen does not support this statement with any specific limitations or diagnostic or clinical data.  Thus, the ALJ was free to reject it.  See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  In addition, Dr. Hermansen noted on the day he rendered this opinion that Plaintiff "late in session present[ed] a GA form regarding inability to work, [and] I ended up signing off on that form."  (Tr. at 413.)  This statement suggests that Dr. Hermansen attributed little weight to the form and signed it merely to end the session or placate Plaintiff.  Dr. Hermansen also recorded on this date that Plaintiff was a poor historian, and it was "unclear" to him "what truly all is going on."  (Tr. at 413-14.)  This acknowledgment that the doctor did not understand Plaintiff's medical history and condition further supports the ALJ's decision to disregard the opinion given on that day.

In conclusion, the ALJ did not err by crediting the portions of her doctors' opinions that were

unfavorable to Plaintiff over more favorable comments.  The Court may not reverse the ALJ merely because substantial evidence exists to support a different conclusion.

C.      Whether the ALJ Correctly Assessed Plaintiff's Credibility

Plaintiff next argues that the ALJ failed to correctly assess her credibility because he did not denote inconsistences in the record and did not address each of the factors required by  Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  Plaintiff does not state whether she is challenging the ALJ's consideration of her complaints of pain or psychological state, and she does not identify which factors the ALJ supposedly neglected to address.

In assessing subjective complaints, an ALJ must examine several factors:  "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski, 739 F.2d at 1322).  Other relevant factors are the claimant's work history and the objective medical evidence.  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (citing Polaski, 739 F.2d at 1322).  The ALJ may discredit subjective complaints based on "inconsistencies in the evidence as a whole," Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001) (citation omitted), as long as he gives his reasons for doing so, Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997).  "The ALJ need not explicitly discuss each Polaski factor," as long as he acknowledges and considers the factors before arriving at his ultimate credibility determination. Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citing Brown, 87 F.3d at 966).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide. Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

19

The Court begins by noting that, contrary to Plaintiff's position, the ALJ largely found her complaints of pain and corresponding functional limitations credible.  Although he rejected her ultimate claim of inability to work, this claim is not a specific, subjective complaint subject to a <u>Polaski</u> analysis. Every claimant makes this fundamental claim simply by filing an application for disability benefits.

To the extent the ALJ discredited Plaintiff's subjective complaints, it is clear from the ALJ's decision that he considered all of the <u>Polaski</u> factors even though he did not systematically address them.  Initially, the ALJ found that Plaintiff experienced moderate restrictions in her activities of daily living.  (Tr. at 24.)  He noted that she lived independently and stayed at home unless she had a doctor's appointment.  (<u>Id.</u>)  While acknowledging Plaintiff's self-reported panic attacks, the ALJ also remarked that Plaintiff had been going out more and playing bingo.  (<u>Id.</u>)  The ALJ further noted that Plaintiff was completely able to care for herself, cook, and do household chores.  (<u>Id.</u>)  The ALJ also observed that some of Plaintiff's reports of daily activities were inconsistent, and he detailed the inconsistencies.  (<u>Id.</u> at 28.)

As to the alleged duration, frequency, and intensity of any pain, the ALJ balanced Plaintiff's claim of daily back pain against her sporadic treatment for that pain.  (<u>Id.</u> at 25.)  The ALJ also considered Plaintiff's physicians' reports that Plaintiff moved easily, with little tenderness or restraint. (<u>Id.</u> at 26.)  The ALJ additionally took note of Plaintiff's statement to her doctor in April 2005 that her back pain flared up only once or twice a year.  (<u>Id.</u>)  As to Plaintiff's subjective complaints of mental impairments, the ALJ noted that Plaintiff has suffered depression and anxiety since she was a teenager but nevertheless was able to be gainfully employed for many years.  (<u>Id.</u> at 27.)  The ALJ also recounted discrepancies in the reports of duration, frequency, and intensity of Plaintiff's depressive

episodes and anxiety.  (<u>Id.</u> at 27-28.)

The ALJ regarded the dosage, effectiveness, and side effects of Plaintiff's medication for both her physical symptoms and her mental condition.  (<u>Id.</u> at 26, 27.)  He noted that Plaintiff was prescribed a muscle relaxant and Ibuprofen for her occasional back pain.  (<u>Id.</u> at 26.)  The record indicates that this medication was effective in resolving Plaintiff's pain given that Plaintiff rarely sought treatment for this pain, which the ALJ found significant.  The ALJ also commented on Plaintiff's failure to take her depression and anxiety medicine.  (<u>Id.</u> at 27.)  However, as the ALJ noted, when Plaintiff took her medicine, her symptoms improved.  (<u>Id.</u>)  Adjustments in Plaintiff's medications also ameliorated her symptoms.

With respect to precipitating and aggravating factors and functional restrictions, the ALJ mitigated Plaintiff's credibility based on her "fluctuating employment history" and the lack of evidence that Plaintiff made any effort to find work or attend vocational training.  (Tr. at 28.)  Another precipitating factor of note was Plaintiff's tendency to isolate herself, rather than a demonstrated inability to leave her home.  (Tr. at 24-25.)  The ALJ accepted Plaintiff's reported functional restrictions insofar as they were consistent with brief and superficial contacts with others, the ability to understand and follow simple instructions, and working at a moderate pace with only simple production goals.  (<u>Id.</u> at 28.)

Finally, the ALJ considered the objective medical evidence throughout his credibility assessment, noting inconsistencies where they existed and explaining why he chose one report or statement over another.  (<u>Id.</u> at 23, 25-27, 29.)  Most damaging to Plaintiff's subjective complaint of back pain is Dr. Lucas's opinion in September 2003 that Plaintiff's back pain would not qualify her for

disability benefits.  (Id. at 392.)  The ALJ took note of Dr. Lucas's corresponding treatment notes.  (Id. at 26.)  In addition, as discussed throughout this Report and Recommendation, there is ample objective medical evidence discrediting the severity of Plaintiff's reported agoraphobic reactions, panic attacks, and anxiety.

Under the facts of this case, the Court cannot say that the ALJ improperly assessed the credibility of Plaintiff's subjective complaints.  Accordingly, the Court finds that substantial evidence in the record as a whole supports the ALJ's credibility determination.

### D.   Whether the ALJ Established that the VE's Testimony Was Consistent with the DOT

As her final argument, Plaintiff submits that the ALJ did not establish on the record that the VE's testimony was consistent with the DOT.  Social Security Ruling (SSR) 00-4p requires an ALJ to obtain explanations on the record for any conflicts between a VE's testimony and the DOT's description of appropriate jobs.  SSR 00-4p  (Soc. Sec. Admin. Dec. 4, 2000).  When the Appeals Council remanded Plaintiff's case to the ALJ during the administrative phase, it explicitly instructed him to "inquire, on the record, as to whether" his recommended jobs were consistent with the DOT.  (Tr. at 203-04.)  It appears from the record that the Appeals Council took this action because the VE in the first hearing did not have an opportunity to explain how and to what extent second- and third-shift work would erode the occupational base for a food packager position.  (Tr. at 114-18.)

Although the ALJ did not explicitly question the VE at the second hearing as to whether his recommended jobs were consistent with the DOT, the ALJ did not err because there were no inconsistencies to resolve, as was the case in the first hearing.  In addition, the VE in the second hearing

cited to specific DOT job numbers, and his testimony was clear that the jobs he described as suitable

for Plaintiff were consistent with the DOT descriptions of those jobs.  For example, the DOT describes

both the "stuffer" and laundry worker jobs as light exertional level jobs, which is consistent with the

VE's testimony.  Although the DOT describes the "sorter" job as sedentary, this is immaterial because

a person who can perform light work generally can also perform sedentary work.  See 20 C.F.R. §

404.1567(b).

It is true that the VE reduced the number of laundry worker jobs from 25,000 to 200.

However, he explained he did so in order to accommodate Plaintiff's persistence and pace limitations.

This is a reasonable explanation for the reduction, and the ALJ included the reason for the reduction in

his decision.  (Tr. at 30.)  In addition, the ALJ noted that the reduction in the number of jobs did not

make the job inconsistent with the DOT.  (Id.)  Consequently, even though the ALJ did not abide by

the Appeals Council's instructions on remand to the letter, the substance of the VE's testimony and

ALJ's decision conforms to SSR 00-4p.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.        Plaintiff's Motion for Summary Judgment (Doc. No. 12) be **DENIED**; and

23

2.      Defendant's Motion for Summary Judgment (Doc. No. 15) be **GRANTED**.


Dated:  July 19, 2007

                                          s/ Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 3, 2007, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.